IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.   Criminal Action No. 3:12-cr-00082

LENORA BANKS-DAVIS,
*a.k.a.*, Jacqui Banks-Davis,
        Defendant.

## MEMORANDUM OPINION

THIS MATTER is before the Court on the defendant's motion for a new trial. The defendant, Lenora Banks-Davis, argues that government witnesses violated the Court's order pursuant to Federal Rule of Evidence 615 and that she consequently deserves a new trial. Rule 615 mandates the exclusion of witnesses "so that they cannot hear other witnesses' testimony," whenever either party requests or the Court makes such an order on its own. At the beginning of Banks-Davis's trial, the Court ordered only that witnesses be excluded from the courtroom until after they had finished testifying. Banks-Davis does not contend that witnesses entered the courtroom during other witnesses' testimony; instead, she raises concerns about comments that one government witness made to other witnesses, outside the courtroom, as they were waiting to testify.

The Court denies Banks-Davis's motion because, first and foremost, government witnesses violated neither Rule 615 nor the Court's order on witnesses. Their discussions fall outside the scope of the rule, and the Court's order did not extend the scope of the rule to cover out-of-court communications between witnesses.

Nonetheless, even if Banks-Davis can establish a violation of Rule 615, she suffered no prejudice. Given the wholly discrete character of each witness's testimony, their interaction could not have led to any fabrication, inaccuracy, or collusion. All of the supposedly tainted witnesses testified only briefly about transactions that Banks-Davis carried out at their respective businesses. Business records support and corroborate their testimony. None of these witnesses evinced any particular view of Banks-Davis—either explicitly or through their tone or body language. In short, any overheard out-of-court remarks had no influence on the other witnesses' testimony or observable attitudes and, accordingly, no influence on the outcome of the trial.

## I. STATEMENT OF FACTS

Banks-Davis was charged with one count of bank fraud under 18 U.S.C. § 1344, one count of unauthorized use of an access device under 18 U.S.C. § 1029, and one count of aggravated identity theft under 18 U.S.C. § 1028A. The central issue at trial was whether Banks-Davis knowingly used credit cards belonging to another person, without permission. At the beginning of the trial, the Court issued a ruling pursuant to Federal Rule of Evidence 615. It stated, "[W]e will have a rule on the witnesses. Anybody that is going to testify has to remain outside until they are called."

On the morning of the second day of trial, the government witnesses gathered in the witness waiting room, located just outside the courtroom. The individuals present were Ms. Jean Diamond, Mr. William Irvin, Ms. Ruby Jennings, Ms. Jennifer Traylor, Mr. Robert Wright, and Ms. Shaun Aigner-Lee. Ms. Diamond, without any prompting from the other individuals, said several things to the others. First, she said that she was tired from the previous day, for her direct examination had occurred the day before. Second, Diamond said that she knew Banks-Davis from the church that both of them attended and that, in her opinion, Banks-Davis may have been

2

using the church as a place to seek other targets for her crimes. Third, she said that it was worth testifying in order to prevent others from becoming Banks-Davis's victims. Finally, she described her church-related activities, including choir and missionary work. According to witness William Irvin, her entire series of remarks reportedly took only "60, 90 seconds."

Given the claim of witness influence, the Court must review the testimony of the witnesses on the day of Diamond's out-of-court statements.

First, Diamond took the stand for her cross-examination. The previous day, she had explained that she and Banks-Davis met in February 2012. After that meeting, Banks-Davis persuaded Diamond to loan her money. More importantly, Banks-Davis subscribed to credit cards in Diamond's name, using personal information that she had acquired through one-on-one discussions.[1] On cross-examination, defense counsel first questioned Diamond about whether she understood that Banks-Davis was going to apply for a credit card in her name. There was no examination whatsoever regarding any specific credit card expenses. Defense counsel then asked whether Banks-Davis had paid back the money that she owed to Diamond. The entire cross-examination lasted only a few minutes. Other than the fact that the witness met Banks-Davis through church, none of Diamond's testimony was discussed in the witness waiting room.

William Irvin, an attorney with his own small law firm, testified next. He spoke only about his joint representation of Banks-Davis and another woman, Portia Turner, on two occasions in 2000. At that time, Irvin wrote two letters addressed to debt collectors stating that Banks-Davis would assume legal responsibility for certain debts in Turner's name. The first letter also stated that Turner's accounts had been opened without her authority or knowledge. All the information in the letters came directly from Banks-Davis, and these letters were the only

---

[1] This is essentially the same conduct that Banks-Davis engaged in with the victim in the case.

subject that Irvin addressed as a witness. None of Irvin's testimony was discussed in the witness waiting room.

When subsequently interviewed, Irvin did not recall any of the other witnesses' saying anything about their anticipated testimony in the waiting room.[2] He said: "I had the sense they were sitting there telling their story on why they were there and how they knew Banks-Davis. . . . They did not talk about their upcoming testimony."

Ruby Jennings then testified. Jennings owns a beauty salon where Banks-Davis was a customer in the summer of 2009. Jennings testified about services for which Banks-Davis paid with Turner's charge card. The government presented several exhibits during Jennings's testimony: first, a receipt from a charge made with Portia Turner's credit card at the beauty salon in the amount of $35 on June 26, 2009; second, an appointment book showing that Banks-Davis had an appointment at the salon on that same day; third, another receipt showing a charge made with Portia Turner's credit card in the same amount on July 18, 2009; and, lastly, a personal "client card" that the salon kept for Banks-Davis, which said explicitly that Banks-Davis "use[d] Portia Turner's credit card." Jennings then testified that she personally recalled Banks-Davis's use of Turner's credit card. "I remember looking at [the credit card] and looking at her," Jennings stated. "And she implied she was allowed to use this when her money wasn't right. And I assumed that was fine." On cross-examination, defense counsel did not question the accuracy of any of Jennings's testimony, all of which Jennings had corroborated with business records. Later on, when asked whether anything she heard from other witnesses had any impact

---

[2] After the alleged witness misconduct occurred, the government and defense lawyers jointly interviewed the witnesses at trial concerning Diamond's influence on them. Counsel have provided transcripts of those interviews for consideration in ruling on this motion.

on her testimony, Jennings replied, "No, how can mine? Mine are dates, did she show up? I mean no offense, but . . . ."

Shaun Aigner-Lee appeared after Jennings. Ms. Aigner-Lee, a manager at a photography studio, testified that she received an order from Banks-Davis in 2009. During this testimony, the government presented the order paperwork as an exhibit. It showed a billing date of May 27, 2009, the specific quantity and size of photographs ordered, and the total balance of $89.25, and it was attached to the credit card invoice from the payment, dated June 26, 2009. The invoice stated the last four digits from the credit card used for the payment, which matched the digits from Portia Turner's credit card. Aigner-Lee said that she did not have a customer named Portia Turner. On cross-examination, defense counsel did not challenge whether this specific transaction actually took place.

After trial, Aigner-Lee was also asked whether anything she heard from other witnesses generally or from Diamond specifically had any effect on her testimony. She responded in the negative, later adding, "My testimony was pretty straightforward. It was about an invoice. There is nothing that can sway what is written on a piece of paper."

Jennifer Traylor (formerly Reynolds) was the next witness. Traylor worked at an animal hospital and had known Banks-Davis since she first became a customer in 2005. Traylor recounted a transaction in the summer of 2009 when Banks-Davis brought in one of her two dogs for medical treatment. The hospital's business records showed that the bank had returned a payment check from Banks-Davis on June 18, 2009. The following day, Banks-Davis paid her veterinary bill with Turner's credit card. Banks-Davis also paid a veterinary bill with Turner's credit card in August 2009. Traylor knew that Banks-Davis used Turner's credit card for both of these payments because only Banks-Davis had ever been to the animal hospital and Turner had

never been a customer in her own right. On cross-examination, the government did not challenge whether Banks-Davis made these transactions with Turner's credit card.

When later asked whether any conversations in the witness room affected her testimony, she responded, "Uh uh, no, just, you know, everybody was nervous." She also added that what the witnesses discussed had "absolutely" no impact on her testimony.[3]

The final relevant witness was Robert Wright, the manager of a retail self-storage facility. As store manager, he handled payments, and he came to know Banks-Davis as a customer in late February 2009. His business records included a "transaction history" detailing all transactions that occurred with respect to Banks-Davis's rental unit from account creation through termination. One of the transactions was a credit card payment of $424 on July 27, 2009, made with Turner's card. Wright also identified a receipt for a separate payment with the same credit card, and this time Banks-Davis's signature appeared on the document. After that, Wright testified that his business never had a customer named Portia Turner. On cross-examination, defense counsel did not attack the veracity of Wright's direct examination testimony in any way.

Like the others, Wright was asked whether anything that transpired between the witnesses had any impact on his testimony. He stated, "No. I will say one thing though: We were all nervous." He explained that the other witnesses asked Diamond about her testimony from the previous day only to make sure that it was not like "Law and Order." Without discussing the substance of her earlier testimony, Diamond reassured them that the experience was "not as intimidating as it looks on TV." He also said "That was the thing. When I went to the stand, everything was just so straightforward there was no opinion. It was just what was on the piece of paper. . . ."

---

[3] Linda Shifflet testified after Traylor, but Shifflet was not in the waiting room and heard none of the comments made by other witnesses.

The jury found Banks-Davis guilty of the first two counts and acquitted Banks-Davis on the third count. During the jury's deliberations, counsel brought the interaction between the government witnesses to the Court's attention. This motion followed.

## II. STANDARD OF REVIEW

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). At the same time, "a trial court 'should exercise its discretion to award a new trial sparingly.'" *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006) (quoting *United States v. Perry*, 335 F.3d 316, 320 (4th Cir.2003)). "Just as the district court has broad discretion in resolving a new trial motion, so too does it enjoy discretion whether to hold an evidentiary hearing on the motion." *United States v. Smith*, 62 F.3d 641, 651 (4th Cir. 1995). "This is because 'the acumen gained by a trial judge over the course of the proceedings' makes the court 'well qualified' to rule on a motion for a new trial without an evidentiary hearing." *United States v. Tzeuton*, 370 F. Appx. 415, 421 (4th Cir. 2010) (citing *United States v. Hamilton*, 559 F.2d 1370, 1373–74 (5th Cir. 1977)).

## III. DISCUSSION

*A. Government Witnesses Did Not Violate Rule 615 or the Court's Order*

Banks-Davis is plainly not entitled to a new trial if the witnesses did not violate any Federal Rule of Evidence or Court order. The critical threshold issue is therefore whether either Rule 615 or the Court's order not only prevented witnesses from being present for each other's testimony but also prohibited their out-of-court discussions before and after testimony. Neither Rule 615 nor the Court's order limited the witnesses' out-of-court discussions.

In *United States v. Rhynes*, the Fourth Circuit, sitting *en banc*, confronted the issue of whether either Rule 615 or the district court's sequestration order, entered under Rule 615,

prohibited a *lawyer* from discussing an earlier witness's testimony with another witness who had yet to testify. 218 F.3d 310 (4th Cir. 2000) (en banc). *Rhynes* presents a slightly different question than the instant case involving witnesses' talking to each other. Nevertheless, *Rhynes* sheds light on the issue in this case.

In *Rhynes*, the Fourth Circuit referred repeatedly to "extending language," 218 F.3d 310, 317, 320 (4th Cir. 2000), which, when employed, would result in a "sequestration order that *exceeds* the express bounds of Rule 615." *Id.* at 321, n. 13 (emphasis added). Such "extending language" stands in contrast to the "plain and unambiguous language" of the rule itself, which "serves only to exclude witnesses from the courtroom." *Id.* at 316. This part of the *Rhynes* opinion (*i.e.*, Part II) garnered only a plurality of the Court; thus, it does not carry the same weight as a majority opinion.[4] In the absence of any contrary holding by the Fourth Circuit, this Court will follow *Rhynes*' reasoning.[5]

The *Rhynes* plurality was indeed clear that "extending language" is necessary not only when excluding individuals other than witnesses from the courtroom but also when extending the rule beyond the mere fact of witnesses' *presence in the courtroom*. It said, for instance, that the "district court's bald Rule 615 order was then *extended* by the statement that 'the witnesses shall not discuss one with the other their testimony.'" *Id.* at 317 (emphasis added). And it quickly

---

[4] In a concurring opinion, Judge Luttig added, "I believe Judge King is . . . unquestionably correct in his interpretation of Federal Rule of Evidence 615." 218 F.3d 310, 327 (Luttig, J., concurring). Judge Luttig was one of only five judges who supported this outcome, out of the ten Fourth Circuit judges who participated in the disposition of this appeal. Several judges, however, did not even reach the question of Rule 615's scope, *see, e.g., id.* at 324 (Wilkins, J., concurring), giving added weight to the plurality opinion.

[5] In *United States v. McMahon*, a divided Fourth Circuit panel affirmed a district court's holding that a witness violated a sequestration order when he had his secretary attend proceedings, take extensive notes, and get daily transcripts, which the secretary would then share with him during the court's lunch break. 104 F.3d 63 (4th Cir. 1997). Although the witness was not physically in the courtroom, his conduct amounted to sitting in and listening to the witnesses, a far cry from what happened here.

8

reaffirmed that "neither the bald invocation of Rule 615 nor the *extending language relating to discussions between witnesses* served to circumscribe the conduct of [the attorney] in any way." *Id.* (emphasis added). In short, without this "extending language," Rule 615 apparently means nothing more than it literally states. It leaves witnesses free to discuss matters with one another outside the courtroom, even when those discussions touch on issues that have arisen or will arise inside the courtroom.

In this case, the Court's sequestration order did not "exceed the scope of Rule 615." *Id.* at 321, n. 13.[6] The order did not expressly forbid witnesses from speaking to one another. It simply stated, "[W]e will have a rule on the witnesses. Anybody that is going to testify has to remain outside until they are called." In the absence of any extending language, the Court did not prohibit witness communication and therefore no violation of Rule 615 or Court order occurred. Given this conclusion, the Court must deny the motion for a new trial.

*B. Any Violation of Rule 615 Was Harmless*

The Court has thoroughly reviewed the transcripts of the witnesses' trial testimony and their post-trial interviews, attended by counsel for both the government and Banks-Davis. Nothing in the transcript or the interviews indicates that Ms. Diamond's remarks influenced the witnesses' testimony or attitudes toward Banks-Davis. As noted above, the witnesses testified very briefly, about matters corroborated by documents and not in factual dispute. All the witnesses maintain that Diamond had no effect on them, and nothing to which any of them testified could plausibly have been altered by Diamond's offhand remarks. Thus, even assuming for the sake of argument that government witnesses violated Rule 615, the Court finds any such

---

[6] "If a district court, in its discretion, determines to grant a sequestration order that exceeds the express bounds of Rule 615, the order should at least: (1) be explicit; (2) be of record and timely; and (3) be tailored as narrowly as possible to achieve its purposes without hindering counsel in performance of their duties to clients and the court." *Id.* at 321, n. 13.

nonconformity harmless and accordingly denies Banks-Davis's motion for a new trial. *See, e.g., United States v. Etienne*, 293 Fed. Appx. 977, 979 (4th Cir. 2008) (holding that the district court's decision to permit a non-sequestered witness to testify was harmless error, even assuming for the sake of argument that the court failed to recognize that a violation of Rule 615 occurred).

The purpose of Federal Rule of Evidence 615 is "to discourage and expose fabrication, inaccuracy, and collusion." *Opus 3 Ltd. v. Heritage Park*, Inc., 91 F.3d 625, 628 (4th Cir. 1996). Stated otherwise, Rule 615 aims to "prevent the possibility of one witness shaping his testimony to match that given by other witnesses at the trial." *Id.* (quoting *United States v. Leggett*, 326 F.2d 613, 613 (4th Cir. 1964). The record in this case does not present any reason to believe that Diamond's remarks had such an impact. Instead, relying heavily on one Fourth Circuit decision from more than two decades ago, the defendant argues that "it would be nearly impossible to prove the extent of the damage caused by the violation of the Court's sequestration order" and therefore asks the Court to find a rebuttable presumption of prejudice. *See* Def.'s Opening Brief at 6 (citing *United States v. Farnham*, 791 F.2d 331, 334 (4th Cir. 1986)).

*Farnham*, however, differs significantly from the present case. There, the defendant's conviction on a particular count "turned exclusively" on the credibility of the defendant relative to the credibility of two government agents. The agents were not sequestered during each other's testimony. *Farnham*, 791 F.2d at 334. As a result, the defendant suffered an unfair disadvantage in his inability "to test each agent's credibility, independent of the other's testimony." *Id.* at 334–35. The Fourth Circuit held that "the district court erred in refusing to sequester [the second agent to testify], if not during the entire trial, at least during the testimony of his colleague." *Id.* at 335.

Here, no such swearing contest occurred between Banks-Davis and the prosecution. To review the evidence:

- Attorney William Irvin's testimony dealt with a completely separate subject matter from any other witness's testimony. It revolved around his joint representation of Banks-Davis and Turner in 2000, and Irvin's work product supported all of his direct examination testimony. Banks-Davis did not attempt to undermine Irvin's credibility at trial. Even with the benefit of hindsight, she fails to explain how the exchange in the witness room brings his credibility into question.

- The remaining witnesses in question testified that Banks-Davis carried out transactions at their respective businesses with a credit card belonging to Portia Turner. As with Irvin, Banks-Davis did not try to challenge the accuracy of their testimony. Rather, she primarily sought to elicit the witnesses' knowledge of whether Banks-Davis had authorization to use the card. Banks-Davis has produced no evidence showing any collusion on these factual questions. Indeed, Diamond's statements could not logically have affected the witnesses testimony. All of these witnesses testified about *discrete* transactions at *discrete* times and locations, supported by business records. Diamond's statements could not have planted such transactions in the witnesses' minds or influenced their individual recollections of such transactions.

Further, the Court observed the testimony of the witnesses. After reviewing the transcript and recalling the witnesses, the Court finds that none of the witnesses showed any animus toward

Banks-Davis.[7] Their testimony was straightforward and unemotional. Clearly, Diamond's comments did not stir up the witnesses either to sympathize with the victim or to speak accusatorily about Banks-Davis.[8]

In short, as an alternative ground to deny the motion for a new trial, the Court finds that the Diamond statements did not prejudice Banks-Davis.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Date: January 4, 2013
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[7] Banks-Davis suggests that the Court should hold an evidentiary hearing on this motion. The Court has reviewed the transcript and can recall the witnesses' testimony without difficulty. A hearing is not necessary.

[8] Apparently some of the witnesses pitied Banks-Davis. Wright stated, "We were just, I guess we were just discussing we felt bad for her. . . . For Lenora, because the person that we met, of course, is one person. Then having her to come to court, we just felt bad because we knew her as our customer." (Wright Interview 9.) Other witnesses similarly added that they felt no hostility toward Banks-Davis.